# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLY PORRECA AND** | : | |
| **CHARLES WALTON, on behalf** | : | **CIVIL ACTION** |
| **of themselves and all others** | : | |
| **similarly situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE ROSE GROUP** | : | |
| **d/b/a APPLEBEE'S NEIGHBORHOOD** | : | |
| **GRILL AND BAR,** | : | **No. 13-1674** |
| **Defendant.** | : | |

## <u>MEMORANDUM</u>

**Schiller, J.**                                                    **December 11, 2013**

Following a common trend, The Rose Group, a restaurant management company that owns and operates thirty-nine Applebee's restaurants in Pennsylvania, requires its employees to agree to arbitrate employment disputes. Charles Walton works as a server at an Applebee's in Jenkintown, Pennsylvania. Trouble arose in the neighborhood, causing Walton and Carly Porreca[1] to sue The Rose Group[2], individually and on behalf of a putative class, claiming that it failed to properly compensate servers in violation of federal and state law. The Rose Group seeks to stay this litigation and to compel Walton to arbitrate his claims—on an individual basis—against it. Walton argues that he should be allowed to proceed in this Court because the arbitration agreement he signed is unconscionable. As unappetizing as the result may be, the state of the law compels this Court to grant Defendant's motion and stay these proceedings so that Walton can arbitrate his claims on an

---

[1] Porreca was dismissed from this lawsuit, leaving Walton as the only remaining named Plaintiff.

[2] In this Memorandum, the Court uses "Applebee's," "The Rose Group," and "Defendant" interchangeably.

individual basis against Defendant.

## I.      BACKGROUND

### A.      Allegations

Plaintiff and putative class members are current and former employees at various Pennsylvania Applebee's restaurants, all of which are owned and operated by The Rose Group. (Compl. ¶¶ 2-3.) They allege that Applebee's has a "longstanding policy and practice of paying tipped employees less than the hourly minimum wage yet requiring these tipped employees to spend a substantial amount of time performing an array of duties outside of the duties of their tipped positions for which there is no possibility of earning tips." (*Id.* ¶ 4.) Applebee's required tipped employees, such as servers, bartenders, and hosts, to show up for work a half an hour prior to the start of their shift and to stay at work after their shift ended to clean, dust, sweep, vacuum, wash dishes, stock food supplies and to perform other untipped work. (*Id.* ¶¶ 5, 16.) According to the Complaint, Plaintiffs spent a significant amount of time performing this untipped work yet were paid subminimum wages. (*Id.* ¶ 17.)

The litigation is brought as a collective action under the Fair Labor Standards Act ("FLSA") as well as class action under Federal Rule of Civil Procedure 23. The Class consists of "[c]urrent and former employees of Defendant who are or were working as servers, bartenders, hosts and other tipped hourly employees at an Applebee's location in Pennsylvania for the three year period prior to the date this complaint is filed through the entry of judgment in this case." (Compl. ¶ 18.) Plaintiffs bring claims pursuant to the FLSA and the Pennsylvania Minimum Wage Act ("PMWA").

### B.     Arbitration Agreement

The merits of the allegations in the Complaint are not currently the Court's focus. The Court must decide the proper forum, judicial or arbitral, for this dispute.

Walton executed an "Agreement and Receipt for Dispute Resolution Program," which includes the following clauses relevant to The Rose Group's motion:

> I have received a copy of the Dispute Resolution Program for Rose Casual Dining, LP, Delaware Valley Rose, LP, CB Rose, LP, and Rose Management Services, Inc. (the "Company") and have read and understood its contents. . . . I recognize that differences may arise between the Company and me during or following my employment with the Company, and that those differences may or may not be related to employment. I understand and agree that any such differences will be resolved as provided in the Dispute Resolution Policy.

(Def.'s Renewed Mot. to Compel Individual Arb. and Stay Proceedings [Def.'s Renewed Mot.] Ex.

A [Agreement and Receipt for Dispute Resolution Program].)

> **MUTUAL PROMISE TO RESOLVE CLAIMS BY BINDING ARBITRATION.**
> The Company and I agree that all legal claims or disputes covered by the Agreement must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive final remedy for resolving any such claim or dispute. We also agree that any arbitration between the Company and me is of an individual claim and that any claim subject to arbitration will not be arbitrated on a collective or a class-wide basis; provided however, that this provision shall not apply to any prospective class or collective action based on alleged violations of wage and hour laws if, and only if, such claim should cause the agreement to arbitrate to be unenforceable under the prevailing law.
>
> The mutual obligations set forth in this Agreement shall constitute a contract between the Employee and the Company but shall not change an Employee's at-will relationship or any term of any other contract or agreement between the Company and Employee. This Policy shall constitute the entire agreement between the Employee and Company for the resolution of Covered Claims. The submission of an application, acceptance of employment or the continuation of employment by an individual shall be deemed to be acceptance of the dispute resolution program. No signature shall be required for the policy to be applicable.
>
> Legally protected rights covered by this Arbitration Agreement are all legal claims,

3

including: claims for wages or other compensation; claims for breach of any contract, covenant or warranty (expressed or implied); tort claims (including, but not limited to, claims for physical, mental or psychological injury, but excluding statutory workers compensation claims); claims for wrongful termination, sexual harassment; discrimination (including, but not limited to, claims based on race, sex, sexual orientation, religion, national origin, age, medical condition or disability, whether under federal, state or local law); claims for benefits or claims for damages or other remedies under any employee benefit program sponsored by the Company (after exhausting administrative remedies under the terms of such plans); "whistleblower" claims under any federal, state or other governmental law, statute, regulation or ordinance; claims for a violation of any other non-criminal federal, state or other governmental law, statute, regulation or ordinance; and claims for retaliation under any law, statute, regulation or ordinance, including retaliation under any workers compensation law or regulation.

I understand and agree that by entering into this Agreement, I anticipate gaining the benefits of a speedy, impartial dispute resolution procedure. This procedure is explained in the Dispute Resolution Program Booklet, which I acknowledge I have received and read or have had an opportunity to read.

(*Id.*)

The Agreement and Receipt for Dispute Resolution Program also contains the following

provision:

**VOLUNTARY AGREEMENT.** I acknowledge that I have carefully read this Agreement, I understand its terms, that all understandings and agreements between the Company and me relating to the subjects covered in this Agreement are contained in it, and that I have entered into the Agreement voluntarily and not in reliance on any other promises or representations by the Company other than those in the Agreement itself and the Dispute Resolution Program.

I further acknowledge and agree that I have been given the opportunity to discuss this Agreement with my own private lawyer and have used that opportunity to the extent that I wish to do so. This Agreement shall apply to me, my representatives, executors, administrators, guardians, heirs and assigns in any action where a claim could be brought.

(*Id.*)

As outlined in the Dispute Resolution Program Booklet, Defendant follows a five-step

4

process for resolving workplace disputes between Defendant and its employees. Step one is titled "Communication" and encourages an employee to talk directly to an immediate supervisor, talk to management, and contact an associate hotline. (Def.'s Renewed Mot. Ex. B [Dispute Resolution Program Booklet] at 1.) Step two is to contact Defendant's vice president of human resources; step three is an executive review, in which Defendant's chief operating officer reviews the issue and attempts to resolve the issue; step four is mediation, in which an "objective, independent third party" helps; and step five is arbitration. (*Id*. at 2-3.) If appropriate, the employee may skip the communication step; Defendant may skip steps one through three if a legal claim is involved. (*Id*. at 6.) Legal claims subject to arbitration include claims for wages or other compensation, and claims for violation of non-criminal federal or state laws. (*Id*. at 4.)

According to the Dispute Resolution Program Booklet, the "arbitration shall apply the substantive law and the laws of remedies, if applicable, in the state in which the claim arose, or federal law or both, depending upon the claims asserted." (*Id*. at 5.) With respect to attorneys' fees, the Dispute Resolution Program Booklet states that "[e]ach party shall be responsible for its own attorneys' fees and related litigation expenses, if any; however, if any party prevails on a statutory claim which allows the prevailing party to be awarded attorneys' fees, or if there is a written agreement providing for fees, the arbitrator may award reasonable fees to the prevailing party." (*Id*.) The interpretation of the dispute resolution agreement is governed by the Federal Arbitration Act. (*Id*. at 6.)

The Dispute Resolution Program Booklet further states that "**IS A CONDITION OF YOUR EMPLOYMENT AND IS THE MANDATORY AND EXCLUSIVE MEANS BY WHICH THOSE PROBLEMS MAY BE RESOLVED, SO READ THE INFORMATION IN THIS**

PROGRAM BOOKLET CAREFULLY." (*Id.* at 1.) (emphasis in original).

    C.    **Unconscionabilty Record**

On May 24, 2013, Defendant filed a motion to stay proceedings and compel individual arbitration. In response, Plaintiff argued that the agreement was unconscionable. Following Plaintiffs' response, the Court determined that it could not decide the issue without a record. The Court therefore ordered the parties to conduct limited discovery to address Plaintiffs' unconscionability argument.

Walton is twenty-eight years old. (Def.'s Renewed Mot. Ex. C [Walton Dep.] at 8.) He graduated high school in 2003 and attended Columbia University for two years and the University of Miami for one year, but he did not graduate college because he could not afford to continue. (*Id.* at 14-17.) Dina Morgan, a general manager at Applebee's prior to her promotion to area director, handed Walton an application for employment on April 5, 2011, had a manager interview him sometime between April 5 and April 16, 2011, and subsequently called Walton for an orientation. (Def.'s Renewed Mot. Ex. D [Morgan Dep.] at 10-11, 14, 20-21.)

Walton had three interviews before he was hired; following the third interview, he was told that he was hired and that he could start training. (Walton Dep. at 37-38.) It is undisputed that Walton attended an orientation led by Morgan on April 16, 2011. (*Id.* at 57-58; *see also* Def.'s Statement of Undisputed Facts in Supp. of its Mot. to Compel Individual Arb. and Stay Proceedings [Undisputed Facts] ¶ 28.) During this orientation, Walton was presented with and signed a number of documents, including the arbitration agreement. (Pls.' Resp. to Def.'s Mot. to Compel Arb. Ex. A [Walton Decl.] ¶¶ 2, 6.) It is unclear, however, whether Walton was a new hire or remained a prospective hire at the time of the orientation. Based on Walton's declaration, which was attached

to his response to Defendant's original motion to compel arbitration, the orientation was for employees; Walton's deposition testimony, however, was that the orientation was for prospective employees and that he was not yet hired to work at Applebee's at the time he signed the arbitration agreement. (*Compare* Walton Decl. ¶ 2 ("Several days after I was hired, I was seated in a room with several other newly hired employees and Applebee's management presented me with several documents that I and the other employees were told to sign. I was required to sign these documents to continue my employment at Applebee's.") *with* Walton Dep. at 111 ("In my mind, I was pretty confident that I was going to be hired, but I wasn't officially hired.") & 120-21 (admitting that he was not officially hired at the time of the orientation).) Applebee's position was that Walton had been hired at the time of the orientation. (Morgan Dep. at 22 (testifying that Walton had been "officially hired" at the time his orientation was scheduled).)

As noted, Morgan led the orientation that Walton attended at Applebee's Jenkintown location. (*Id*. at 28, 48.) Morgan told Walton that if he did not sign the paperwork given to him right then, he could not be hired. (Walton Dep. at 107.) Walton could not remember reading the arbitration agreement or asking questions about it. (*Id*. at 58-60.) Walton could not recall if Morgan said anything about The Rose Group's dispute resolution program during the orientation, though Morgan did tell those present at the orientation to discuss employment issues with managers. (*Id*. at 109-110.) According to Morgan, a number of documents were distributed and reviewed at the orientation, including the dispute resolution agreement. (*See* Undisputed Facts ¶ 39.) The dispute resolution program was explained to the new hires at the orientation, but the new hires were to read the Agreement and Receipt for Dispute Resolution Program on their own during the orientation. (Morgan Dep. at 111.) The Dispute Resolution Program Booklet was provided to Walton during the

orientation. (*Id*. 124.) The extent to which the dispute resolution program was explained at the orientation is a matter of disagreement between the parties. (*See* Pl.'s Mem. of Law in Opp'n to Def.'s Renewed Mot. to Compel Individual Arb. [Pl.'s Opp'n] at 9.) Morgan also testified that the forms were not required to be signed and returned prior to the conclusion of the orientation. (Morgan Dep. at 62.) In fact, Morgan recalled one instance in which an employee took home "the dispute resolution form" so that her father, an attorney, could review it. (*Id*. at 62, 64.) However, Walton would not have been permitted to start work until he signed the arbitration agreement.[3] (Morgan Dep. at 68-69.) In Morgan's experience, however, that issue never arose because all of the new hires have signed the paperwork. (*Id*. at 69-70.)

According to Walton, prior to his lawyer explaining the arbitration agreement to him, he "didn't understand the full scope of this, the full scope of what was going on with this. [He] didn't understand that it wouldn't apply to class actions." (Walton Dep. at 69.) He further stated that he did not understand the "bulk of the document." (*Id*. at 87.) Indeed, Walton did not read the arbitration agreement prior to signing it on April 16, 2011. (*Id*. at 126-27.) When asked why he signed the arbitration agreement without reading it, Walton responded, "I signed it because they were put in front of me and if I wanted the job I had to sign these documents and I needed the job." (Walton Dep. at 127.) Similarly, he did not consult an attorney because he believed that if he did not sign the documents put before him, he would not get the job, which he needed. (*Id*. at 107.) Walton did not ask anybody if he could negotiate the terms of his employment or seek advice; he believed that he had "to sign or that's it." (Walton Dep. at 112-113.)

---

[3] Later during her deposition, Morgan said that she did not want to assume what would happen if a new hire refused to sign the dispute resolution agreement. (Morgan Dep. at 110.)

Paul Rockelmann, vice president of human resources at The Rose Group, testified that he was unaware of any situation in which an employee refused to sign the arbitration agreement, but he stated that signing the agreement is a condition of employment. (Def.'s Renewed Mot. Ex. E [Rockelmann Dep.] at 41-42.) Additionally, no one has asked to negotiate the arbitration agreement. (*Id*. at 42-43.) If someone did make such a request, however, Rocklemann would discuss the matter with outside counsel. (*Id*. at 43.)

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id*. § 4. Before ordering parties to arbitrate, the Court must decide whether the parties entered into a valid agreement to arbitrate. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 264 (3d Cir. 2003); *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997).

Recently, the Third Circuit clarified the standard for district courts to apply when faced with a motion to arbitration. "[W]hen it is apparent based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). However, if the complaint and its supporting documents are unclear about the agreement to

arbitrate, or if the party seeking to avoid arbitration has put forth additional facts sufficient to place the agreement to arbitrate in issue, "the motion to compel arbitration must be denied pending further development of the factual record." *Id*. at 775. Following this limited discovery on the question of arbitrability, the court may entertain a renewed motion to compel arbitration. *Id*. This renewed motion to compel must be reviewed using a summary judgment standard. *Id*. Under this standard, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking to compel arbitration bears the initial burden of showing that the non-movant has failed to establish one or more essential elements of its case. If it meets this burden, the party seeking to avoid arbitration must point to specific facts in the record that demonstrate that there is a genuine issue for trial. *Guidotti*, 716 F.3d at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986)).

Because the Complaint did not make clear that the parties' dispute was subject to arbitration and Plaintiffs put forth evidence suggesting that the agreement to arbitrate was unconscionable, the Court ordered limited discovery on the issue of arbitrability. Having completed that discovery, and faced with a renewed motion to compel arbitration, the Court applies a summary judgment standard to Applebee's renewed motion to compel arbitration.

## III.    DISCUSSION

### A.    General arbitration principles

Unquestionably, the FAA establishes a strong policy in favor of arbitration. *See Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010). Nonetheless, there is also a strong legal

principle that, "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980).

Plaintiffs contend that the agreement to arbitrate is unconscionable and therefore unenforceable. To prove unconscionability under Pennsylvania law, a plaintiff must show that the contract is both procedurally and substantively unconscionable. *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012); *see also Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) ("The party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability."). "In examining these two prongs, the Pennsylvania Supreme Court has indicated that it might be appropriate to use a 'sliding-scale approach' so that 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required' and presumably, vice-versa." *Quilloin*, 673 F.3d at 230 (quoting *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 125 & n.12 (Pa. 2007)).

### B. Procedural unconscionability

#### 1. Standard

Procedural unconscionability examines the process leading to the formation of the contract and the form and language of the agreement. *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 228 (3d Cir. 2008); *Estate of Hodges v. Green Meadows*, Civ. A. No. 12-1698, 2013 WL 1294480, at *6 (E.D. Pa. Mar. 29, 2013) ("Procedural unconscionability bears on the circumstances surrounding the manner in which an agreement is reached, along with the form and appearance of the agreement itself."). A contract that is procedurally unconscionable is marked by a lack of a meaningful choice in the acceptance of the challenged provision. *Quilloin*, 673 F.3d at 235. Under

11

Pennsylvania law, a contract of adhesion, defined as "a standard-from contract prepared by one party, to be signed by the party in the weaker position, usually a consumer, who adheres to the contract with little choice about the terms," is usually deemed procedurally unconscionable. *Id*. Unequal bargaining power alone, however, is insufficient to conclude a contract is procedurally unconscionable. *Id*.; *Gokhberg v. Sovereign Bancorp, Inc.*, Civ. A. No. 11-1884, 2011 WL 3862155, at *2 (E.D. Pa. Sept. 1, 2011). Courts must consider the following factors in determining whether the contract is procedurally unconscionable: "the take-it-or-leave-it nature of the standardized form of the document, the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party." *Quilloin*, 673 F.3d at 235-36.

> 2. *Parties' arguments*

According to The Rose Group, Walton's procedural unconscionability arguments fail because "the undisputed facts establish that The Rose Group provided him with the Arbitration Agreement, reviewed portions of the Dispute Resolution Program with him in detail, gave him time to review the remainder of the Dispute Resolution Program as well as the Agreement before he signed, and gave him a copy of the Dispute Resolution Program to take home with him for further review." (Def.'s Mem. of Law in Supp. of its Renewed Mot. to Compel Individual Arb. and Stay Proceedings [Def.'s Mem.] at 4-5.)

Walton counters with a litany of issues that he claims show the procedural unconscionability of the arbitration agreement. Plaintiff points out that "the Arbitration Agreement is an eight page, single-spaced, standard form contract prepared for the Rose Group by one of their vendors." (Pl.'s Opp'n at 14.) Plaintiff also notes that he was required to sign a stack of papers and had to "sign his name over 19 times on various documents." (*Id*. at 15.) Additionally, Walton points out that the

arbitration agreement was presented as a take-it-or-leave-it proposition. (*Id*. at 14-15.)

       3.     *Analysis*

          *a.*     *Take-it-or-leave-it*

As a threshold matter, the parties dispute whether Walton was provided sufficient time to review and understand the document presented to him. Walton also disputes that Morgan thoroughly explained the dispute resolution program during the orientation and that he was provided with a copy of the arbitration agreement.

The arbitration agreement contains a clause that explicitly states that Walton "carefully read this Agreement, understood its terms" and was "given the opportunity to discuss this Agreement" with an attorney. (Agreement and Receipt for Dispute Resolution Program.) Walton's deposition testimony contradicts the sentiments expressed in the document he signed. Generally, when such a contradiction goes unexplained in the record, it cannot create a genuine issue of material fact. *See Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012) (noting rule that "self-serving deposition testimony" cannot alone create genuine issue of material fact). Here, however, Walton argues that he was compelled to sign the arbitration agreement because he was not afforded time to review it. Accordingly, the Court cannot resolve this issue without making a credibility determination, which it cannot do at this stage.

The Court agrees that the take-it-or-leave-it nature of the arbitration agreement weighs in favor of a finding of procedural unconscionability. If Walton had refused to sign the arbitration agreement, he could not have worked at Applebee's. Indeed, the Agreement and Receipt for Dispute Resolution Program states that "the submission of an application, acceptance of employment or the continuation of employment by an individual shall be deemed to be acceptance of the dispute resolution program."

Furthermore, according to Defendant's human resources vice president, the terms of the arbitration agreement were not subject to negotiation. The Rose Group highlights that Walton was provided with the arbitration agreement, was afforded the opportunity to review it, and was provided with a copy of the agreement which an attorney could review. However, as noted previously, Walton disputes these contentions. Even if these facts were clearly and undisputably in Defendant's favor, however, the take-it-or-leave nature of the arbitration agreement is clear. Furthermore, it is of little use that an employee can read and review an agreement if signing an agreement is mandatory and non-negotiable. *See Alexander*, 341 F.3d 256, 266 (3d Cir. 2003) (finding procedural unconscionability due to take-it-or-leave-it agreement even though record contained evidence that arbitration agreement was fully explained during orientation).

However, Plaintiff's argument in favor of procedural unconscionability also relies on what he deems Morgan's failure to identify many key aspects of the arbitration agreement. (Pl.'s Opp'n at 18.) Plaintiff cites no law for this proposition that an arbitration agreement becomes procedurally unconscionable because the employer failed to explain certain terms deemed important. The terms of the arbitration agreement were explained in the document Plaintiff received and signed. If Defendant provided this agreement to Plaintiff in clear form and language, the Court is aware of no additional requirement to conduct an orientation to discuss the terms of the agreement with the employee and ensure that the employee understands all of its terms.

Ultimately, the Court concludes that Defendant's arbitration agreement was presented to Walton as a take-it-or-leave proposal.

        *b.*    *Unequal bargaining power*

Walton further maintains that the agreement is procedurally unconscionable because of the

14

parties' unequal bargaining power. On one side is The Rose Group, a restaurant management behemoth, ready to devour the college dropout desperately in need of a job. Defendant focuses on the fact that Walton "was highly educated and capable of understanding the Arbitration Agreement." (Def.'s Mem. of Law in Supp. of its Renewed Mot. to Compel Arb. [Def.'s Mem.] at 5.) Defendant also notes that "contrary to his suggestion that he was financially dependent upon The Rose Group, the undisputed evidence establishes that at the time Plaintiff signed by the Agreement, he did not even believe that he was employed and had alternative job opportunities available to him." (Def.'s Mem. at 5.) The Rose Group also questions Walton's financial straits based on alternative job offers he had at other chain restaurants. (Undisputed Facts ¶ 64.) Defendant also points out that Walton entered and won money in several poker tournaments. (*Id.* ¶ 70.)

Plaintiff has the better argument here. He was in debt, living with his parents, and behind in his student loans. He needed to work. Furthermore, the fact that Walton had offers with other restaurant chains does not negate the bargaining disadvantage in which he was placed. To suggest that he had bargaining power because he could wait tables elsewhere ignores reality. If Walton refused to arbitrate any future claims he might have against Defendant, he would have been required to find alternative employment in a different neighborhood.[4] Additionally, Walton testified that his other job offers were not on par with Defendant's offer because the other offers required him to start lower on the restaurant food chain. (Walton Dep. at 31.) Finally, Walton's modest poker winnings did not alter the balance of power in this relationship.

There is sufficient evidence in the record for this Court to conclude that the parties were not

---

[4] The record contains no evidence about whether Walton's other possible employers would have required him to sign an arbitration agreement giving up his rights to proceed collectively with his wage claims in a court of law.

on equal footing and that Walton was economically compelled to accept Defendant's terms.

c.   *Plaintiff's other arguments in favor of procedural unconscionability*

Walton also argues that the arbitration agreement is procedurally unconscionable because it is "an eight page, single-spaced, standard form contract prepared for the Rose Group by one of their vendors." (Pl.'s Opp'n at 14.) Plaintiff also notes that he was required to sign a stack of papers and had to "sign his name over 19 times on various documents." (*Id*. at 15.)

This particular argument for procedural unconscionability is not persuasive. The Court has reviewed the arbitration agreement; it is not an undecipherable tome requiring a doctorate degree and magnifying glass to read and comprehend. Furthermore, Walton is an educated man, able to read and comprehend English. The Court is not convinced by Walton's argument that he received a stack of papers and had to sign his name multiple times. It is common for paperwork to be completed before beginning a job and there is nothing onerous about an individual signing his or her own name on these documents. There is no argument that Plaintiff was handed irrelevant documents, complicated in nature, and under intolerable conditions. Thus, the Court rejects any argument that the appearance of the arbitration agreement or the circumstances under which Walton signed the agreement is a reason to invalidate it.

However, viewing the record in its entirety, the Court concludes that Plaintiff has established that the agreement is procedurally unconscionable.

### C.   Substantive unconscionability

Ultimately, even a finding of procedural unconscionability will not render unenforceable the arbitration agreement here. In addition to procedural unconscionability, substantive unconscionability is required. Substantive unconscionability refers to whether the terms of the agreement unreasonably

16

favor the party asserting it. *Zimmer*, 523 F.3d at 228. "Substantively unconscionable terms are those that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Estate of Hodges*, 2013 WL 1294480, at *6.

Plaintiff argues that the arbitration agreement is substantively unconscionable because it fails to guarantee attorneys' fees and costs if Plaintiff prevails, fails to provide guaranteed liquidated damages to Plaintiff if he prevails, and precludes Plaintiff from bringing a collective action on behalf of other similarly situated employees.

### 1.   *Attorneys' fees*

The Dispute Resolution Program Booklet states: "Each party shall be responsible for its own attorneys' fees and related litigation expenses, if any; however, if any party prevails on a statutory claim which allows the prevailing party to be awarded attorneys' fees . . . the arbitrator may award reasonable fees to the prevailing party." (Dispute Resolution Program Booklet at 5.) Plaintiff contends that the arbitration agreement denies him the right to guaranteed attorneys' fees and costs should he prevail. (Pl.'s Opp'n at 23.)

The FLSA contains a fee-shifting provision: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Thus, attorneys' fees are mandatory under the FLSA. *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 135 n.31 (3d Cir. 1984) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 261 n.34 (1975)).

"Provisions requiring parties to be responsible for their own expenses, including attorneys' fees, are generally unconscionable because restrictions on attorneys' fees conflict with federal statutes providing fee-shifting as a remedy." *Quilloin*, 673 F.3d at 230-31; *see Nino v. Jewelry Exch. Inc.*, 609

F.3d 191, 2003 (3d Cir. 2010). If, however, the arbitration agreement is ambiguous about the awarding of attorneys' fees, the ambiguity is to be addressed by the arbitrator. *Quilloin*, 673 F.3d at 231.

This Court cannot hold that the attorneys' fee provision substantively unconscionable. First, it allows for the possibility of an award of attorneys' fees should Plaintiff succeed on his claim under the FLSA. Plaintiff argues that, under the FLSA, he would be guaranteed fees and costs; however, he provides no support that this language contained in the arbitration agreement renders it substantively unconscionable. The provision at issue covers all fee-shifting statutory claims, some of which might include mandatory fee-shifting provisions, some of which might include permissive fee-shifting provisions. Furthermore, the arbitration agreement also directs that "[t]he arbitration shall apply the substantive law and the laws of remedies, if applicable, in the state in which the claim arose, or federal law or both, depending upon the claims asserted." (Dispute Resolution Program Booklet at 5.)

Because the arbitration agreement does not foreclose an award of attorneys' fees as permitted by law, the attorneys' fees provision here is not unconscionable. *See Pyo v. Wicked Fashions, Inc.*, Civ. A. No. 09-2422, 2010 WL 1380982, at *12 (D. N.J. Mar. 31, 2010) ("Given the fact that Plaintiff's claims in this case are premised on statutes allowing for such awards, he may be entitled to attorneys' fees if he prevails. Therefore, the Court finds that the attorneys' fees provision contained in the Arbitration Agreement is not substantively unconscionable."); *see also Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 185 (E.D. Pa. 2010) (in a mandatory fee-shifting case, refusing to find substantively unconscionable arbitration provision that allowed arbitrator to award attorneys' fees). The most that can be written about whether the arbitrator must award attorneys' fees to Plaintiff

should they succeed on their claims is that the arbitration agreement is ambiguous on the question. The provision is therefore not unconscionable.

Additionally, The Rose Group has removed any ambiguity in its memorandum in support of its renewed motion to compel arbitration. The Rose Group states that the "Arbitration Agreement *permits* an arbitrator to grant attorneys' fees when a statute allows for them, but *requires* that attorneys' fees and all other statutorily mandated remedies be provided to a prevailing plaintiff as mandated by controlling law." (Def.'s Mem. at 12.) This is a reasonable reading of the language and the Court expects that Defendant will be held to that interpretation; if Walton prevails, he is entitled to attorneys' fees.

### 2.    *Liquidated damages*

The FLSA contains a provision for liquidated damages: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The arbitration agreement is silent regarding liquidated damages, but an arbitration agreement is not substantively unconscionable merely because it is silent on an issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). Furthermore, as noted previously, the arbitrator "shall apply the substantive law and the laws of remedies if applicable, in the state in which the claim arose, or federal law or both, depending upon the claims asserted." (Dispute Resolution Program Booklet at 5.) Thus, as The Rose Group concedes, an arbitrator must provide "all other statutorily mandated remedies . . . to a prevailing party as mandated by controlling law." (Def.'s Mem. at 12.) This agreement does not limit or alter Walton's rights and remedies on the issue of liquidated damages and the agreement

19

is therefore not substantively unconscionable with respect to liquidated or statutory damages. *See Quilloin*, 673 F.3d at 230 ("An arbitration agreement cannot be construed as substantively unconscionable where it does not alter or limit the rights and remedies available to a party in the arbitral forum.").

### 3.   The tiered nature of the arbitration agreement

Plaintiff takes issue with the five-step process set up to resolve disputes. Specifically, Plaintiff complains about the "egregiously one-sided mediation process" that allows the company to select the mediator and allows the arbitrator to dismiss a claim for arbitration if the party seeking arbitration fails to first attempt mediation. (Pl.'s Opp'n at 23.) Additionally, Plaintiff objects that The Rose Group, but not Plaintiff, can skip the first three steps of the process: communication with a supervisor or management, human resources review, and review by the chief operating officer or chief financial officer, prior to proceeding to mediation. (*Id.*; *see also* Dispute Resolution Program Booklet at 6.)

The fact that The Rose Group has a system in place for raising and resolving work place issues is not substantively unconscionable. *See Quilloin*, 673 F.3d at 234. Plaintiff offers no reason why the fact that Defendant selects the mediator is substantively unconscionable. The mediation is non-binding and the "mediator does not make the final decision." (Dispute Resolution Program Booklet at 3.) If the parties cannot come to an agreement, they move onto arbitration. The fact that the employer can skip certain steps does not render the tiered process unfair. As Defendant points out, it would be odd to have management raise issues with itself before proceeding to mediation and arbitration. (*See* Def.'s Mem. at 20.) Furthermore, if any employee has an issue with the company, the company "realize[s] that in some cases it may not be appropriate to use Step 1, Communication." (Dispute Resolution Program Booklet at 6.) In those cases, the employee may proceed directly to the

20

second step. Far from being substantively unconscionable, this is a reasonable provision.

Because Plaintiff has failed to demonstrate that the tiered nature of the arbitration agreement unreasonably favors Defendant, the Court cannot strike down as substantively unconscionable an agreed upon procedure for dealing with claims between an employee and employer.

###### 4.    Class/collective action waivers

At this point in the analysis, Walton has not given up anything by arbitrating his claims rather than litigating those claims. He is entitled to the same remedies regardless of whether he litigated or arbitrated his claims. He is also entitled to attorneys' fees if he prevails.[5] Turning now to the waiver of class and collective actions, it can no longer be said that the arbitration track is identical to the litigation track. Although there is law that highlights the importance of making courts available to hear collective actions brought under FLSA, the law is now clear that such rights can be waived.

As a threshold matter, the Court questions the wisdom of allowing individuals to so readily relinquish their rights to collectively bring an FLSA claim in court. The validity of agreements to arbitrate federal statutory claims is not in doubt. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). In the context of the FLSA, however, the Supreme Court has explicitly recognized that Congress afforded employees "broad access to the courts" to ensure the congressional purpose of "protect[ing] all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739-40 (1981). Congress "intended to give individual employees the right to bring their minimum-wage claims under the FLSA in court,

---

[5] Of course, he is giving up his right to a jury trial, to have discovery overseen by a federal judge, to have dispositive motions decided by a court, as well as the possibility of court intervention to help settle this matter. The Court's previous statement refers only to those provisions of the arbitration agreement being challenged here.

and because these congressionally granted FLSA rights are best protected in a judicial rather than in an arbitral forum," Plaintiff presents a compelling argument regarding the importance of vindicating rights granted by the FLSA in court. *See id.* at 745.

Additionally, courts have recognized the importance of the collective action to bring to light violations of the FLSA. The FLSA reads: "An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). In *Walthour v. Chipio Windshield Repair, LLC*, Civ. A. No. 12-1491, 2013 WL 1932655 (N.D. Ga. Feb. 27, 2013), the court recounted the history of the FLSA, including the "right of action" provision, which guaranteed the right to bring a collective action under the statute. *Walthour*, 2013 WL 1932655, at *4-5. The *Walthour* court set out to determine whether an employee's inability to proceed on a class or collective basis in arbitration prevented him or her from vindicating substantive rights under the FLSA. *Id.* at *5-10.  The court found "persuasive authority . . . to support Plaintiffs' argument that the right to participate in a FLSA collective action is substantive rather than merely procedural" and thus "not subject to contractual waiver." *Id.* at *8-10. Nonetheless, the court in *Walthour* compelled arbitration "in the absence of binding precedent holding that such a provision is unenforceable as a matter of law." *Walthour*, 2013 WL 1932655, at *10.

Although strong arguments exist in favor of concluding that the right to proceed collectively in federal court under the FLSA cannot be waived, the Court cannot hold that the collective action waiver contained in the arbitration agreement is substantively unconscionable. The court in *Walthour* noted that "every circuit save one addressing the issue has held that plaintiffs' inability to proceed on

a class or collective basis in arbitration does not prevent them from vindicating their substantive rights under the FLSA." *Id*. at *7 (citing cases); *see also Vilches v. The Travelers Cos.*, 413 F.App'x 487, 494 n.4 (3d Cir. 2011) ("Indeed, there is no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute."); *Dixon v. NBCUniversal Media, LLC*, Civ. A. No. 12-7646, 2013 WL 2355521, at *10 (S.D.N.Y. May 28, 2013) ("This Court joins the vast majority of courts in holding that the right to proceed collectively under the FLSA can be waived in an arbitration agreement."); *Morris v. Ernst & Young LLP*, Civ. A. No. 12-4964, 2013 WL 3460052, at *9 (N.D. Cal. July 9, 2013) ("[E]very circuit court that has addressed the issue has held . . . that arbitration agreements *can* validly waive collective action because Congress did *not* intend to confer a nonwaivable right to a class action under the FLSA.").

Despite the policy of permitting FLSA claims to be brought collectively in federal court, binding precedent forecloses Plaintiff's argument on the substantively unconscionability of a waiver of bringing an FLSA collective action. In *AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740 (2011), the Supreme Court considered a challenge to California's "Discover Bank" rule. Under that rule, California courts concluded that class action waivers in arbitration agreements were unconscionable if the waiver was contained in a consumer contract of adhesion, the dispute involved a small amount of damages, and it was alleged that the party with the superior bargaining power had carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money. Relying on the premises that the FAA evinces a desire to promote arbitration, the Court concluded that the Discover Bank rule interfered with that goal and could not stand. *See Concepcion*, 131 S. Ct. at 1750-51, 1753 ("[C]lass arbitration, to the extent it is manufactured by *Discover Bank*

rather than consensual, is inconsistent with the FAA.").

Relying on *Concepcion*, the Third Circuit Court of Appeals in *Quilloin* examined the propriety of class action waivers under Pennsylvania law in a lawsuit brought pursuant to the FLSA. Prior to *Concepcion*, Pennsylvania law considered class action waivers substantively unconscionable if "'class action litigation is the only effective remedy' such as when 'the high cost of arbitration compared with the minimal potential value of individual damages denie[s] every plaintiff a meaningful remedy.'" *Quilloin*, 673 F.3d at 232 (quoting *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 883–84 (Pa. Super. Ct. 2006)). Ultimately, the court in *Quilloin* concluded that Pennsylvania law was substantively the same as the *Discover Bank* rule and a Pennsylvania law that required class arbitration when the parties contracted for individual arbitration was preempted by the FAA. *Id.* at 232-33.

The Supreme Court recently affirmed the use of class action waivers in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013). In that case, merchants who accepted American Express cards brought a class action antitrust lawsuit against American Express claiming that the company used its monopoly power to force merchants to accept credit cards at rates 30% higher than the fees for competing credit cards. *Id.* at 2308. American Express moved to compel arbitration and to enforce the agreement that no claims be arbitrated on a class action basis.

The Court rejected a plea from the merchants that it would be cost prohibitive to arbitrate on an individual basis. "[T]he antitrust laws do not guarantee an affordable procedural path to the vindication of every claim." *Id.* at 2309. Stated simply, nothing barred enforcement of an arbitration agreement that forbid the merchants from pursuing their claims as a class. Moreover, "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination

24

of the *right to pursue* that remedy. *Id*. at 2311. The agreement between American Express and its merchants merely required that the arbitration involve the two contracting parties; it did not eliminate any party's right to pursue the statutory remedy, and the arbitration agreement was thus enforceable. *Id*.

Viewed collectively, *Concepcion*, *Italian Colors*, *Gilmer*, and *Quilloin* point this Court to one conclusion: the collective action waivers of the FLSA are not substantively unconscionable here. *See Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 (2d Cir. 2013) ("Supreme Court precedents inexorably lead to the conclusion that the waiver of collective action claims is permissible in the FLSA context.").

This current state of legal affairs is lamentable. Workers of Applebee's, as part of their desire to work, signed away their rights to bring a multitude of claims in court. Employers such as Applebee's hold all of the cards here; Applebee's can easily inform prospective applicants that if they do not like the terms of the deal, the applicants can just try to work in a different neighborhood. Its workers must therefore chew on a distasteful dilemma—give up certain rights or give up the job. These agreements are not more palatable because Applebee's arbitration agreement includes form language that the employee has had the opportunity to read the agreement and seek legal counsel prior to signing it. This is, of course, fantasy. How many waiters and waitresses, newly hired by Applebee's, when presented with the dispute resolution program, seek legal advice about their options? The Court will hazard a guess that the number is very few. Most start their jobs and toil without issue. But it is only when a problem arises that the importance of giving up the right to air one's grievances to a court and to perhaps air those grievances collectively takes on extreme importance.

25

The increasing frequency with which these arbitration clauses and class action waivers are employed is unfortunate, and in many situations, unjust. There is a reason that arbitration is the favored venue of many businesses for deciding employment disputes, and it is not to ensure that employees are afforded the best chance to have their claims adjudicated by a judge or jury picked from the community. This Court, however, is not at liberty to ignore the decisions of the United States Supreme Court and the Third Circuit Court of Appeals. Applebee's and the Plaintiffs have a valid arbitration agreement that is not substantively unconscionable and therefore must be enforced.

5.    *Sliding-scale approach*

Finally, Plaintiff suggests that the Court use language from the Third Circuit in *Quilloin* and employ a sliding-scale approach to decide the issue of unconscionability. Specifically, the Third Circuit noted that "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required and presumably, vice-versa." *Quilloin*, 673 F.3d at 230. As Plaintiff sees it, the procedural unconscionablility is so great here, that a lesser degree of substantive unconscionability will suffice to invalidate the arbitration agreement. Though there is support for Plaintiff's legal theory, this is not the proper case to test the contours of the sliding-scale approach. First, although the Court concludes that procedural unconscionability is present here, contrary to Plaintiff's assertion, this is not an egregious example. The Third Circuit has found procedural unconscionability "in an employment agreement where the employee, though college educated, was told to read and sign an employment contract, and was dependant on the employer, one of the world's largest jewelry retailers, for his immigration status." *Quilloin*, 673 F.3d at 236 (citing *Nino*, 609 F.3d at 196-97, 202). In another case, the Third Circuit agreed that procedural unconscionability existed when the company with greater bargaining power required two long-time crane operators with limited

education and job prospects to sign an arbitration agreement on a take-it-or-leave-it basis. *Alexander*, 341 F.3d at 266. Furthermore, the law is clear that none of the provisions troubling Walton is substantively unconscionable. Substantive unconscionability remains a necessary condition to invalidating an arbitration agreement and it is not present here. Therefore, sliding-scale or not, Plaintiff cannot sustain his burden of demonstrating substantive unconscionability.

## IV.    CONCLUSION

Most of the time, the employer/employee relationship is a fruitful, congenial one, without incident. Employees do their work and cash their checks. Employers maintain decent working conditions and, they hope, run a successful business. Moreover, when an incident does arise, it is often settled before resorting to an adversarial process. But there exist circumstances when the issues are too complicated, the parties are too upset, or too much is at stake—in other words, when it really matters— when a judge and jury need to step in. Unfortunately, mandatory individual arbitration often steps in to close the courtroom to those individuals who need to use the courts. From the perspective of the employee, it is foolish for him or her to give up the rights to pursue litigation in court and to pursue those rights collectively. The permissibility of surrendering those rights, however, is no longer in doubt legally. Therefore, Defendant's renewed motion to compel arbitration is granted and this litigation is stayed pending Walton's arbitration of his claims on an individual basis.[6]

---

[6] Given the Court's ruling here, it is unclear whether this litigation will return to this Court. Regardless, the Court is compelled to remind counsel, both of whom are experienced and respected attorneys in this legal community and have appeared before this Court on other matters, that they must remain civil and courteous to each other. The Court suspects that counsel understands why this admonition is appearing in this Memorandum, but if not, the Court directs counsel to Walton's deposition at pages sixty-three through sixty-six, pages seventy-one through seventy-nine, and pages eighty-one through eighty-four.